## CLEVELAND CRANE & ENGINEERING CO. v. READING CHAIN & BLOCK CORPORATION.

District Court, E. D. Pennsylvania. March 26, 1929.

No. 4057.

Kwis, Hudson & Kent, of Cleveland, Ohio, and Joseph G. Denny, Jr., of Philadelphia, Pa., for plaintiff.

Henry N. Paul, Jr., and Henry N. Paul (of Fraley & Paul), both of Philadelphia, Pa., for defendant.

KIRKPATRICK, District Judge. This is a suit in equity based upon alleged infringement of United States letters patent No. 1,577,606 to Earl T. Bennington for a hand-propelled crane, having an electric hoist. It may be stated that this type of crane is particularly adapted to use in wire mills in connection with the operation known as "stripping"; that is, the lifting of coils or bundles of wire, which are ready to be drawn or run through dies, from the blocks or carriers, transporting them to another place in the mill, and depositing them upon the machine from which the wire is to be drawn through the dies in the process of reducing them to the required diameter. Two defenses have been interposed, of which the only one which need be considered is invalidity of the patent by reason of anticipation, lack of invention and patentable novelty.

The four claims of the patent upon which the plaintiff relies are:

"1. In combination with a crane adapted to be moved along a runway, a trolley adapted to be moved along the crane, an electric hoist in said trolley, and a rigid member extending down from the trolley and carrying hoist controlling switches.

"2. In combination with a crane adapted to be moved along a runway, a trolley adapted to be moved along the crane and provided with an electric hoist, and a hollow crane and trolley moving member extending down from the trolley, and provided near its lower end with hoist controlling switches, said hollow member forming a conduit for the wires extending from the switches.

"3. In combination with a crane adapted to be moved along a runway, a trolley adapted to be moved along the crane and provided with an electric hoist, remote controlled switches for operating the hoist, and a rigid member extending down from the trolley and provided near its lower end with hoist controlled switches connected to said remote controlled switches.

"4. In combination with a crane adapted to be moved along a runway, a trolley adapted to be moved along the crane and provided with an electric hoist having remote controlled switches, a rigid pipe connected to the trolley and extending downward therefrom, and a pair of hoist controlling switches near the lower end of said pipe, said pipe constituting a conduit for wiring connecting the last mentioned switches to the remote controlled switches."

It will be seen that each of these claims is for a combination of five instrumentalities. They are: (1) A crane; (2) a trolley; (3) an electric hoist; (4) a rigid member extending downward from the trolley, by which the entire assemblage can be pushed by hand from place to place; and (5) switches controlling the operation of the electric hoist.

In order that we may arrive without delay at the essence of the issue raised by the defense of invalidity, we may take claim 4, which is the narrowest of the claims in suit, and assume that the defendant's structure infringes this claim, if valid. The claim referred to adds to the elements above stated the requirements (a) that the switches controlling the hoist be located near the lower end of the rigid member, which in this claim is described as a pipe, and (b) that the rigid member (called a pipe) constitute a conduit for the wiring, which connects the switches at its lower end with another switch near the hoist, which is described as a "remote controlled" switch.

Now there is no pretense that there is anything new about any of the major instrumen-

talities (the crane, the trolley, the hoist, the rigid member, or the switch), taken separately, which go to make up the patent. Nor can it be asserted, in view of the proved prior art, that the combination of such members without more is patentable. The use of a hollow pipe or rod as a conduit for the wiring may also be eliminated, and it is not seriously contended that this presents a patentable feature. If there is any patentable novelty about this alleged invention, it must lie in the character and location of the switches. The foregoing is all recognized and conceded by the plaintiff, which, upon page 67 of its brief, says: "We do contend that Bennington's invention is limited to having remote control switches of some electrical character which are located on or adjacent to the trolley and which directly control the motor, in conjunction with *electrical* switches located at the lower end of the stiff arm, which electrical switches will control the function of the remote control switches located near the hoist." The defendant does not concede that the patent is so limited, but contends that it is much broader, and constitutes an attempt to acquire a patent upon the entire assemblage. If this were its real scope, it would be obviously invalid. We shall pass this question by without deciding it, and assume for the purpose of this case that the alleged invention is limited as the plaintiff contends.

At this point a further question of interpretation of the patent arises. The plaintiff's position is that, if the claims be read in the light of the specification, and construed in connection with it, the scope of the patent must be narrowed even further than his statement of the limits of the invention as quoted above from the brief, and that what is really called for is that the switch at the lower end of the rigid arm or pipe shall be a push button switch and not a switch of any other type. The defendant points out that the claims do not call for a push button switch, and that the specification, while referring to the push button as a preferred switching means for operating the remote controlled switch or controller located near the hoist, specifically states "the details of the switch are immaterial to the invention"; the conclusion being that any other switching means might be used without departing from the inventor's scheme. The plaintiff says that the switches at the end of the rigid arm must be electrical switches, as distinguished from a lever, pull cord, or other type of mechanical switch, and that the push button is the only type of electrical switch which would clearly conform to the requirements of the patent. Once again we will assume that the plaintiff's interpretation of the patent is correct, at least to the extent of excluding from its scope a lever or purely mechanical switch.

As a result of these preliminary considerations, and taking the conditions of the question as established in each case favorably to the plaintiff's contentions, we are brought to the controlling question in the case. It may be stated as follows: In view of the prior art, is it patentable invention to operate the switch near the hoist by means of a push button electric switch located in the handle of the rigid member?

It is now necessary to consider the prior art. The earliest date which may be set for Bennington's alleged invention is April or May, 1921. The defendant proved three uses in three separate wire mills, all prior to April, 1921. Each of these uses was proved to the satisfaction of the court by the full measure of proof required by law, and the court finds as a fact that uses existed at the time and in the manner as testified to by the witnesses Ralston, Phifer, Billowitch, Jaskot, and Straus. The most important of these prior uses for the purpose of this decision was at the Allentown works of the American Steel & Wire Company as early as October, 1920. This installation, as developed subsequently to October, 1920, but prior to April, 1921, was a crane with a rigid arm for moving the carrier around, used, in connection with block stripping, in the same manner as the plaintiff's patent. So far as the crane, trolley, hoist, and rigid member are concerned, it was in all respects a complete anticipation of the plaintiff's patent. There was only one switch controlling the hoist. It was located overhead, and was, in the first type used, controlled by two pendant cords. Shortly afterward a rod was added, paralleling the rigid member for part of its length, and the two cords attached to the ends of a crosspiece upon this rod, which crosspiece could be moved by moving the rod on a pivot on the rigid member. Then, within a month of the original installation, the cords were dispensed with, and a lever was added at the lower end of the rod, and the rod made movable up and down, so that it could be operated from the handle of the rigid member by moving the lever up and down. This in turn operated the electric switch near the hoist by direct mechanical action. The installation at the Allentown mill was substantially the plaintiff's patent, except that, instead of an electric push button switch at the handle of the rigid member, there was a mechanical switch consisting of a lever. When the operator wanted to

238

raise or lower the load, instead of pressing a button, he moved a lever to the right or left. The lever did exactly the same thing that the push buttons did; that is, it operated an electrical switch located near the hoist. If the operator grasped the rigid member at the point where the lever joined it, it was entirely possible for him to operate the whole device with one hand, and this is what was usually done, although some operators found it convenient to use one hand for pulling the crane about and the other for operating the lever.

It need hardly be mentioned that there was nothing new about the use of a push button switch for operating an electrical motor located at a distance from the switch. Patent No. 195,363, to Kirby, shows this use in connection with a vacuum cleaner, and it is established by the testimony in this case that it had even been used in connection with hoisting cranes, although the cranes on which it had been used were steam cranes of the jib type.

The whole of the plaintiff's accomplishment consisted in operating the switches which controlled his motor by means of other switches (of the electrical push button type) instead of a lever. It may be that the change added slightly to the convenience with which the crane could be operated, but there is not the slightest evidence that the Allentown installation did not operate with entire satisfaction during the long period of time that it was in use. In fact, the evidence is to the contrary. It does not appear that it was the plaintiff's device which made it possible for the operator to run the crane with one hand, leaving the other hand free to guide the rod. As has been seen, the lever switch could be and was operated by the same hand which moved the crane. The essence of the device described by the plaintiff's patent is the idea of operating the electric hoist from the point at which the hand of the operator is placed to guide the crane. This idea appears in all the prior uses proved, especially in the Allentown use, and merely taking a well-known standard piece of mechanism such as a push button switch, and substituting it for a lever switch, involved no patentable novelty or invention and no advance in the art beyond its normal development in the hands of mechanics of ordinary skill.

There was considerable discussion of the effect of the clauses in the plaintiff's claims by which the switches were described as "remote controlled" switches. No clear or satisfactory definition of the meaning of the expression "remote controlled" was given, but I think it perfectly clear that the character of the overhead switches had nothing whatever to do with the essential feature of this device. The plaintiff himself says, in his specifications, that the details of the switches are immaterial, and, as has been pointed out, the essential feature of the device is the control of the hoist from the handle of the rigid member. Here, if anywhere, we must look for invention and the prior uses, and the state of the art make it clear that no invention lies in the plaintiff's device. While testimony as to the occupation of the field by the plaintiff's machine to the exclusion of earlier forms often has a bearing on the question of invention, it is not controlling, and, when a comparison of the plaintiff's structure with those of the prior art shows no advance beyond the natural improvement by ordinary skilled operators or mechanics, such testimony has little, if any, effect.

The conclusion reached makes it unnecessary to consider the portion of the defendant's case based upon an implied license.

The bill may be dismissed, with costs to be taxed by the clerk.